# FACTS

12/12/94- The plaintiff began employment with NYS and consequently, worked successfully for over 20 years.

2005-6 The plaintiff accepted a lateral transfer opportunity from her grade-9 position with NYS Office of Mental Health to an equal grade-9 employment position with NYS Office for People with Developmental Disabilities.

The plaintiff maintained an excellent employee reputation and record throughout her state service.

The plaintiff had never requested her right to Union Representation until said events in this complaint.

The plaintiff has never had any issues with management until said issues in this complaint.

On 8/29/15 Ms. Lafountain instructed the plaintiff to tend to a gender based work assignment, consequently, denying the plaintiff to her earned employment benefit with regards to seniority. Seniority status is a fringe benefit that is earned and utilized to bid or deny available jobs, work assignments and to request time off. Plaintiff claims discrimination against Julie Lafountain.

8/29/15 Ms. Lafountain's work directives for the plaintiff, additionally denied an OPWDD "consumer" her equal rights to civility, privacy and community integration under her Medicaid services and her lawful entitlements. Plaintiff claims breach of the ADA against Julie Lafountain.

9/1/15 Ms. Lafountain breached numerous OPWDD policies and procedures, the collective bargaining, labor/management agreement

and varying NYS laws in order to create the 9/1/15 work hardships for the plaintiff. Ms. Lafountain refused to discuss the proper policy driven resolve with the plaintiff which would have maintained safe caregiving and workplace fairness. Plaintiff claims retaliation against Julie Lafountain. Plaintiff claims reckless endangerment Penal Law 240.24

The plaintiff had never before said events been subjected to such egregious working conditions nor has the plaintiff ever been denied the opportunity to discuss issues with her chain of command up until 8/29/15.

11/5/15 The plaintiffs CSEA Union president Bill Loya additionally refused his duty to represent the plaintiff. Plaintiff claims NYS General Business Law 349.

3/17/15 Ms. Lafountain and Bill Loya repeatedly lied upon the NYS Division of Human Rights review and accordingly on the OPWDD attorney prepared documents for this review. Plaintiff claims Ms. Lafountain and Mr. Loya in violation of the NYS Penal Law 175.30

1/13/16 The plainitff resigned due to unsafe and dangerous working conditions. The plaintiff believes the OPWDD agency refused to support a safe working environment for the plaintiff and the consumers in her care out of retaliation based on 1. formal complaints that the plaintiff had made and 2. The intimate relationship Ms. Lafountain shares with the Deputy Director who supervised her.

## FIRST CAUSE OF ACTION
## GENDER DISCRIMINATION

1. On 8/29/15 The defendant Lafountain, instructed the plaintiff to tend to a work assignment transfer at the Church Ave. Individualized Residential Alternative (IRA) OPWDD group home, which was to be enacted on the following day (8/30/15).

2. Lafountain informed the plaintiff that the unfavorable job assignment was directed at the plaintiff because the plaintiff is of the female gender.

3. Lafountain's directive, breached the plaintiff's terms, conditions and earned employment privilege of seniority status. Consequently, Lafountain's directive provided the less senior male staff member on duty with the plaintiffs earned, seniority status.

4. Lafountain's directive was not in accordance with OPWDD'S re-assignment policy.

5. 6/15, Lafountain was corrected via another OPWDD employee's grievance hearing, regarding Lafountain's refusal to properly follow OPWDD 's re-assignment, policy guidelines which are required in order to ensure safe caregiving.. (As stated in OPWDD policy memorandum dated 5/26/15 which states that assigning staff to unfamiliar IRA home locations is reserved for emergency situations only. The 8/30/15 re-assignment that Lafountain directed was not an "emergency" as defined in OPWDD policy sect. 120.23.

6. Lafountain's directive was not necessary to the success of OPWDD business operations.

7. Lafountain's directive did not meet bona fide occupational qualifications.

8. Lafountain's directive breached Duryea vs. OMRDD.

9. Lafountain's directive breached OPWDD's policy, ADM #2009-03 "minimal changes in procedures will be necessary" to base a job duty solely on ones' gender".

10. Per the same memorandum quoted in line 8 above, Lafountain was responsible to properly schedule the coordination of any gender specific work assignments that meet "consumer" needs, in accordance with federal and state laws.

11. The plaintiff could not offer any more safety or expertise to the Church Ave. location, than the least senior, male staff person who was on duty on 8/29/15 and 8/30/15 could provide.

12. Lafountain approved varying male staff to work at the same Church Ave. location up until 8/29/15 as well as thereafter. Each one of these male staff members worked at the Church Ave. IRA without incident.

13. Overtime opportunities to work at the Church Ave. location before and after 8/30/15 were open to males and females equally.

14. 8/31/15 Open employment positions were up for BID at the Church Ave. location without any mention of this IRA being a female only, staffed work site.

15. Lafountain refused to provide the plaintiff with any person centered (consumer) instructions or the necessary person centered training nor any specific gender role instructions and/or which consumer/s proposedly required a specific need or what that care need might be- at any time upon the work transfer or thereafter.

16. On 8/30/15 upon the plaintiff's arrival to the Church Ave. work re-assignment, the plaintiff learned by individually inquiring with each of the six female consumers residing there, that only one of those females requested a female staff for less than 15 minutes of her intimate washing, hygiene tasks. This same consumer stated that she would prefer a male staff to be on duty as well, as she explained that she felt safer with a male staff person to operate her hoyer lift.

17. There were already two females in place to work at Church Ave. on 8/30/15 3p-11p shift and every other consumer residing at Church Ave. remained independent at their hygiene time and behind a closed door too. The plaintiff's presence made a third female staff on duty.

18. 8/30/15 Upon the plaintiff's arrival to Church Ave., the plaintiff also learned that there was no transportation or community outing required or scheduled for the assigned shift. However, if there had been, then the two, additional female staff on duty, surpassed the transportation requirements of Mental Hygiene law 33.17.

19. On 8/29/15 Lafountain refused to discuss the directive with the plaintiff and instead Lafountain told the plaintiff to grieve the issue with her Union representatives. The Plaintiff responded in agreement to do so. Lafountain then hung up the telephone.

20. 8/30/15 The plaintiff filled out a CSEA grievance and sent it certified mail. In the grievance, the plaintiff documented the personal discrimination based on gender and the additional discrimination against a consumer being referred to in this complaint as "L.R".

21. 9/4/15- The plaintiff received confirmation from Charles Barley, CSEA Labor Relations Specialist re: the grievance based on gender and disability discriminating acts, was received by him and submitted to Bill Loya, CSEA, Local 407 Union President.


## SECOND CAUSE OF ACTION
## ADA TITLE V & III

22. The plaintiffs permanently assigned work location, which the plaintiff won in labor/management agreement, bidding process, is an employment position at the Benedict Rd. Individualized Residential Facility (IRA).

23. L.R is a black, female, consumer. She is a receiver of services from OPWDD and resides at the Benedict Rd. IRA. L.R has no ability to speak/verbalize or express herself. L.R is however, fully alert cognitively, understands her surroundings and thoroughly enjoys all her rights and entitlements without exception nor exclusion of her right to go out into the community and shop, eat at restaurants, pick out favorite items such as nail polish, colorful socks and fashionable clothes with her personal allowance. L.R is a receiver of Home Based Community Waiver services (HCBS).

24. Lafountain's gender based, work assignment directive for the plaintiff on 8/30/15 additionally violated L.R's equal rights under the law.

25. Lafountain depended on L.R's inability to speak, write or verbalize herself in any manner in order for Lafountain to enact the unlawful violations of Mental Hygiene Law 33.01 33.03 and The Principles of Compliance 633.4. which caused L.R to lose her Medicaid billable, entitled integration into the community, for her previously planned, community outing.

26. Prior to and on 8/29 and 8/30 2015 the plaintiff was "person centered trained" to work on behalf of L.R. The plaintiff was legally responsible to uphold numerous laws as well as, the NYS Justice Center, Code of Conduct, when providing care for OPWDD consumers.

27. The plaintiff was pre-assigned and responsible to provide L.R with a "Special 1:1 activity" on 8/30/15.

28. Lafountain's directive for the plaintiff to deny L.R of her rehabilitation service on 8/30/15 was in violation of L.R's rights to civility, The Olmstead Act, OPWDD's own policies, The American with Disabilities Act/ Integration Mandate/Title II and further violated Social Service Law 488 I (2) and 488 (h). 14 NYCRR Part 633.1 and 633.4 and 636-1.2 (ii) Person Centered Planning.

29. Lafountain's directive for the plaintiffs 8/30/15 work transfer, consequently left the Benedict Rd. IRA home, where L.R resides, with strictly and only male staff on duty for her intimate hygiene routine on the evening of 8/30/15. L.R's intensive support plan (ISP), required her scheduled hygiene time to be

allocated during the 3-11pm shift and with 1:1 staff assistance during her intimate hygiene routine. Hence, the plaintiff was supposed to be on duty at Benedict Rd. during this time to provide L.R with her equal, privacy rights under the law.

30. Per mental hygiene law 33.17, male staff cannot transport female consumers alone. Hence, the plaintiff was pre-assigned weeks ahead of time, to meet L.R's person centered needs, rights and entitlements regularly, as well as on 8/30/15. The plaintiff was responsible to take L.R on a "special 1:1 community outing". Which L.R had been looking forward to.

31. Lafountain's directive unlawfully presumed that L.R's lack of ability to speak for her needs, made L.R's rights less deserving than the six, white, females residing at the Church Ave. location. All of which can speak and express themselves without issue.

32. The Church Ave. IRA location housed a consumer named "Lisa". Lisa was/is so favored by the defendant Lafountain, that she has enjoyed dinner at Lafountain's personal residence and has Lafountain's personal cell phone number to call her whenever she chooses.

33. Lisa is, not by her own personal choice or any other avenue, restricted to female staff only. Lisa has been and as of current date is receiving caregiving services from OPWDD Grade-9, male staff members.

34. Per L.R's intensive support plan (ISP), she was scheduled during the 3-11pm shift for 1:1 staff assistance during her intimate hygiene routine. Hence, the plaintiff was supposed to be on duty

at Benedict Rd. during this time to provide L.R with her equal, privacy rights under the law.

35. On 8/29/15 The plaintiff attempted to discuss with Lafountain, the unlawful violations being unduly imposed onto L.R in conjunction with the simultaneous gender discrimination work assignment being imposed onto the plaintiff as being instructed for the following day of 8/30/15.

36. Lafountain refused to discuss this/the issue/s with the plaintiff as stated in line 19 of these paragraphs. Instead, Lafountain challenged the plaintiff to grieve it with the Union. The plaintiff responded in agreement to do so.

37. In the grievance the plaintiff included the discriminatory violations of L.R's rights and the plaintiff's discriminating work assignment, that denied her of her employments fringe benefit of seniority, based on her gender.

38. Consumer neglect and mistreatment are both reportable incidents. 14 NYCRR part 624.

## THIRD CAUSE OF ACTION
## RETALIATION

39. 9/1/15 Plaintiff arrived to work as scheduled for the 3-11pm shift at her permanently assigned work location- Benedict Rd. IRA.

40. Upon the plaintiff's arrival, Lafountain left a series of unfavorable and dangerous work assignments for the plaintiff to follow which Lafountain had pre-planned.

41. Lafountain instructed the plaintiffs lower level, immediate supervisor Robin Ostrander, to dictate the details of the working assignments hardships onto the plaintiff, immediately upon the plaintiff's arrival.

42. The instructions for the plaintiff were to immediately leave her permanent work site (Benedict Rd. IRA) and tend to a work assignment transfer at the Church Ave. IRA until 10pm that evening. In clear breach of OPWDD sect. 120.23.

43. The plaintiff was further instructed to return to her permanent work site at 10pm that same evening and then additionally work there, through the awake overnight shift, until minimally 7am the following morning. (However, there was no other staff member in place or pre-scheduled to relieve the plaintiff until 8am).

44. The plaintiff was further responsible to return back to work for her regularly scheduled 3-11p shift, on the same day, after leaving in the morning.

45. To enact the work instructions in line #42. Lafountain was in violation of OPWDD policy memorandum dated 5/26/15 and Sect. 120.22 OPWDD policy manual).

46. Lafountain was obligated to utilize the "overtime evaluation checklist" as a safety measure with the plaintiff. However, Lafountain refused the plaintiff this obligatory safety measure on the plaintiff's or consumer's behalf.

47. Lafountain imposed these two different employee vacancies for the plaintiff to resolve. Both of which Lafountain had previously

known about for days in advance. To enact this Lafountain violated OPWDD policy sect. 120.23.

48. Lafountain took no measures to ensure that the plaintiff had any help or support to safely administer 6:30am medications at the Benedict Rd. IRA after the plaintiff would be without sleep for over 24 hours. To enact this Lafountain was in violation of NYS Education Law 6908 /Nursing Article 139 (V) 3.

49. Lafountain additionally refused to provide the plaintiff with person specific training for the plaintiff to succeed at the Church Ave. IRA which is necessary for safe & lawful caregiving. To enact this Lafountain was in violation of OPWDD policy sect. 120.23 - "staff are expected to receive necessary training prior to working at an alternative location".

50. In further order for Lafountain to enact the 9/1/15 hardships and establish re-assigning the plaintiff to the Church Ave. location, Lafountain approved to pay a grade 12 staff member, overtime money to cover the plaintiffs regular assigned 9/1/15 shift at the Benedict Rd. location on this day.

51. The grade 12 salary is at three grades higher than the plaintiffs grade-9 position. To enact this, Lafountain further abused her authority and breached The NYS Division of Budget G1024 (NYS overtime regulations).

52. Per OPWDD policy 120.23, Lafountain was obligated to use the overtime rotation roster. However, Lafountain refused to acknowledge that policy also. The plaintiff was not next in turn to perform mandatory overtime. The plaintiff had just performed mandatory overtime on 8/30/15.

53.  Lafountian was supported by her supervisory capacity and motivated by her personal efforts of retaliation, to subject the plaintiff to legal and career halting ramifications via the NYS Justice Center/"staff exclusion list" and/or any number of dangerous outcomes that could have been if the plaintiff made a mistake or error in judgement regarding consumer care, due to the numerous lack of policy and law abiding directives via Lafountain.

54. The sole accountability that was being expected of the plaintiff, despite the numerous OPWDD policy driven solutions in place, caused the plaintiff to fear her work environment. The directives caused working hardships to be severe and dangerous, due to unnecessary sleep deprivation, lack of proper training, excessive burden of responsibility and working under the fear of the retaliation, as the plaintiff has never worked under such policy breaking and unlawful conditions prior to said events.

55.  In the event Lafountain makes a minor or detrimental mistake in her Treatment Team Leader (TTL) position, Lafountain is either not held accountable or represented by an OPWDD staff attorney and/or she would be moved/transferred to another equally, higher up NYS position. The plaintiff at the lowest level of the OPWDD employment positions, does not have the same privileges afforded to her.

56. Lafountain abused her authority to impose dangerous working instructions for the plaintiff to provide unlawful caregiving. It was also demeaning and humiliating for the plaintiff to be refused the opportunity to discuss the situation with Lafountain who was the plaintiffs assigned Treatment "Team" Leader.

57. Lafountain also breached the Collective Bargaining Agreement (CBA) and OPWDD policy (Sect.120.22) to set-up the retaliatory events.

58. Neither vacancy constituted an emergency as defined by OPWDD as "an unforeseen event". Routine sick calls are not emergencies per OPWDD sect. 120.23.

59. Lafountain was obligated by the outline of her employment position as an OPWDD Treatment Team Leader (TTL) to employ coverage for staff vacancies properly and safely.

60. Per OPWDD policy Lafountain was responsible to mandate the part-time employee who had not exceeded 40 working hours that week and it would have been safer (ability to go home and rest) and cheaper to pay, the part-time employee.

61. Lafountain refused to discuss any reasonable solutions with the plaintiff and instead Lafountain told Robin Ostrander to tell the plaintiff that- if the plaintiff wanted to grieve this too, that she (Lafountain) said "go right ahead".

62. Lafountain's NYS OPWDD position as a Treatment Team Leader includes maintaining positive relationships with the lower level employees that she supervises, as well as, demonstrating knowledgeable skills of federal and state laws.

63. Lafountain remained in retaliatory contrast with Mental Hygiene Law 16.35 (3) (4).

64. 9/1/15 Upon hearing the egregious work instructions, the plaintiff became instantaneously filled with fear and anxiety about her state of affairs at work, after making a formal complaint just days before. Consequently, the plaintiff informed her immediate supervisor (Robin Ostrander) that she was feeling ill and leaving work sick.

65. The plaintiff immediately sought medical attention.

66. The plaintiff then sent a second grievance certified mail documenting the 9/1/15 retaliation.

## FOURTH CAUSE OF ACTION
## Penal Law 260.24

67. Lafountain inspired by retaliation against the plaintiff, acted recklessly with regards to consumer physical, mental and morale welfare by conspiring to institute untrained, person centered care and support unlawful and dangerous caregiving.

## FIFTH CLAIM
### TORT OF ECONOMICAL UNLAWFUL INTERFERENCE

68. The Plaintiff sent her first grievance to CSEA Latham, NY via certified mail, documenting discrimination based on the plaintiff's gender and discriminatory violations based on L.R.'s disability.

69. 9/4/15 Charles Barley CSEA Labor Relations Specialist confirmed receipt of said grievance.

70. 9/4/15 Charles Barley confirmed to the Plaintiff that he forwarded the Plaintiffs grievance to Bill Loya CSEA Union President.

71. Charles Barley stated to plaintiff not to send any future grievances to his Latham, NY office. Instead send any future grievances, directly to Bill Loya CSEA Union President in Saratoga Springs, NY.

72. The plaintiff sent her second grievance based on the 9/1/15 retaliation, certified mail, to Bill Loya CSEA Union President, Saratoga Springs, NY.

73. The plaintiff spoke to Charles Barley CSEA Labor relations specialist on or about September 4, 2015, seeking solutions and/or resolve regarding the 9/1/15 retaliatory events. Charles Barley could offer no support or suggestive guidance and only stated that "That's the way it is." (or something to that effect.)

74. On or about September 4, 2015 Bill Loya called the Plaintiff at home and further stated that he was in receipt of the grievance that Charles Barley forwarded to him on the plaintiff's behalf. Bill Loya commented on the lengthiness of this grievance and its content, regarding the discriminatory acts that Lafountain instructed for the plaintiff to follow on 8/29/15.

75. Bill Loya agreed to grieve the case on the plaintiff's behalf, based on the plaintiff's loss of seniority status due to being a female.

76. During or about the second week of September 2016- The plaintiff asked Bill Loya how one could apply for a "Voluntary

Reduction in Work Schedule" as stated under Appendix XII, page 194 of the CSEA-ISU 2011-2016 contract book. Bill Loya stated that the plaintiff does not qualify for that option and instead, only office workers qualify. Plaintiff responded with a secondary idea then, to seek a part-time position with OPWDD and outside of Lafountain's supervisory area.

77. During or about the last week of October 2015-The plaintiff received a letter in the mail from OPWDD confirming the plaintiff's grievance, hearing date for November 5, 2015 at 11am on the O.D Heck Campus at 500 Balltown Road in Schenectady, NY.

78. The plaintiff called Bill Loya one or two days before the scheduled grievance hearing in order to confirm where in the OD Heck building to meet him.

79. Bill Loya instructed the plaintiff to go in through the front entrance of the OD Heck building and then take the stairs to the right and wait for him by the office door that is located there.

80. 11/5/15- The day of the grievance hearing the Plaintiff arrived as scheduled.

SIXTH CAUSE OF ACTION
NYS GENERAL BUSINESS LAW 349

81. Bill Loya nor any other Union representative nor did Lafountain or anyone at all, besides the plaintiff show up for the scheduled hearing.

82. 11/5/15- The plaintiff's inquired with Erica Pittucci Senior Personnel Administrator, the plaintiff learned that the grievance hearing was previously cancelled. Erica Pittucci stated that it's

"unfortunate that everyone else knew about the cancellation except for you" meaning the plaintiff.

83. Plaintiff later learned that Lafountain had been scheduled, for minimally one week prior to the 11/5/15 scheduled grievance hearing in Schenectady, NY to lead an OPWDD staff training in Saratoga, NY.

84. During the Plaintiffs Division of Human Rights (DHR) inquiry, the attorney representing OPWDD stated that Bill Loya's statement for the DHR review is that he "never received a grievance from the plaintiff which mentioned discrimination" Bill Loya also stated via the OPWDD attorney, that he is only in receipt of a grievance from the plaintiff about "retaliation" which Bill Loya further stated via the OPWDD attorney, a grievance about retaliation that "doesn't make sense".

85. The Plaintiff would not have had a scheduled grievance hearing if Bill Loya only received one grievance that on its own "doesn't make sense".

86. The plaintiff provided the NYS DHR with four separate points of evidence that factually and tangibly proved that the plaintiff Bill Loya CSEA was in receipt of the plaintiff's grievance based on the 8/29-30 2015 discriminating acts.

SEVENTH CAUSE OF ACTION
PENAL Law 175.30

87. The plaintiff provided tangible evidence to disprove every additional untruth that Lafountain and Loya claimed throughout the DHR review. NYS DHR still sided with OPWDD hence, the plaintiff again went without any resolve related to fair or legal conditions of her employment.

88. After 20 years of paying Union dues, the plaintiff never once, at any time, has ever has filed a grievance, or ever called upon the union for help, until 8/29-30 2015 when the plaintiff was faced with Lafountain's discrimination and then on 9/1/15 -retaliation.

89. Bill Loya CSEA local 407, Union President has enacted conversion and retaliation, by fraudulently concealing the plaintiff's documentation of civil and penal law breaking activity. Bill Loya chose to enact deceit verses his legal duty to represent the plaintiff.

## EIGHT CAUSE OF ACTION
## CONSTRUCTIVE DISCHARGE

90. As of 9/1/15- Plaintiff remained out of work with the intention to return to work upon assurance from the OPWDD agency that the retaliatory tactics would be halted and corrected.

91. Plaintiff reached out to the following OPWDD staff/officials in search of solutions to halt Lafountain's retaliatory efforts - Erica Pittucci Senior Personnel Administrator, James Doddemeade Deputy Director, Amy Link Human Resources, Bill Loya CSEA Union President, Charles Barley CSEA Labor Relations Specialist, The Employees Assistance Program Coordinator, Chris Christodolu OPWDD Director and Commissioner Delaney. Not any of the parties offered a solution or support. Consequently, the plaintiff sought out professional counseling services to cope with the OPWDD agency's cruelness.

92. 10/15/15 The plaintiff called and spoke to James Doddemeade, OPWDD Deputy Director to request part-time work outside of

Lafountain's supervisory area. J.Doddemeade stated that he would "look into the possibility" and call the plaintiff back.

93. 10/25/15 The plaintiff was still without any information about a job transfer, the plaintiff called Doddemeade again at which time he told the plaintiff to call the "staffing coordinator".

94. 10/27/15 The plaintiff made a verified complaint with NYS Division of Human Rights.

95. The plaintiff called and left voicemail messages for the staffing coordinator (approximately 3-4 different days/times) This person did not return the plaintiffs phone call.

96. 11/4/15 No one showed up for the plaintiff's scheduled grievance hearing at 11am, 500 Balltown Rd. Schenectady, NY.

97. 11/9/15- Bill Loya CSEA telephoned the plaintiff suggesting an employment possibility, outside of Lafountain's supervisory area- in Clifton Park, NY. The plaintiff agreed to the prospect and agreed to provide a return work medical note for 11/21/15.

98. Bill Loya never contacted the plaintiff again.

99. 11/11/15- The plaintiff's co-worker from the Benedict Rd. IRA location, informed the plaintiff that that she observed the immediate supervisor, Robin Ostrander, packing up the plaintiff's personal effects. (Which to current date the plaintiff has still not received.)

100. 11/18/15- The plaintiff received a notice in the mail from James Bishop Director of OPWDD Human Resources stating that the plaintiff needs to provide a return to work note in order

to return to her full time position at the Benedict Rd. IRA.
Otherwise her the plaintiff's employment positon would be
posted for other employees to bid on as of 12/1/15.

101. 11/20/15 The plaintiff responded to James Bishop's 11/18/15
notice via a faxed letter, explaining the plaintiff's confusion and
hope to receive a part-time position outside of Lafountain's
supervisory area.

102. During the months of September, October and November
2015, the OPWDD agency declined to respond to the plaintiff's
continuous request of a reasonable accommodation, regarding a
part-time, work location transfer, opportunity. The agency had
approximately one hundred, part-time, employment vacancies
outside of Lafountain's supervisory area. Yet, not any one of the
OPWDD officials in the position to do so, would assist the
Plaintiff with obtaining one of these employment positions.

103. 11/23/15- The plaintiff telephoned Delores Lark at Affirmative
Action to discuss events previously noted in this complaint.

104. Delores Lark assured the Plaintiff that she would immediately
hear from someone at OPWDD regarding the opportunity to go
back to work part-time, in a location outside of Lafountain's
supervisory area. Lark additionally instructed the plaintiff to call
immedietly call her back (Delores Lark) directly after hearing
from someone at OPWDD RE: a job transfer. As of 11/24/15 the
plaintiff still did not hear from anyone within OPWDD.

105. 11/24/15 The plaintiff called Delores Lark again to infokrm her
that the plainitff still has not heard from the OPWDD agency. At
which time, it could be implied that Delores Lark sounded taken

a back that the plaintiff was still uniformed. Delores Lark followed by stating that the plaintiff would hear something on this day, now meaning the day of 11/24/15.

106. 11/30/15 The plaintiff then called Amy Link OPWDD Human Resources. At which time, Amy Link mentioned that she was shocked, that no one had called the plaintiff because the plaintiff had a start date in Clifton Park, NY on December 2, 2015. Less than two days away.

107. On December 2, 2015 Plaintiff began work at the new location.

108. On December 24, 2015 the plaintiff was directed by a Mr. Bowman at OPWDD to work an unfamiliar IRA in East Greenbush, NY. Under this circumstance the plaintiff was led to believe that her work assignments on this day would be as a support staff and not a core staff person, due to lack of proper training for this specific location. The plaintiff was made to drive over an hour away to this location. Upon arrival, the plaintiff was handed the keys for medication administration which were due to be administered in 30 minutes after the plaintiff's schedule arrival. There were 8 unfamiliar to the plaintiff, folks residing in this IRA home, each person with no ability to verbalize themselves.

109. 12/24/15 the plaintiff telephoned Chris Christodulo, who was the Administrator on Duty, in search of support and/or assistance as the plaintiff was nervous to immediately administer medications without any familiarity at this East Greenbush OPWDD IRA location. Chris Christodulo stated she would call the plaintiff back however, she did not. The plaintiff was expected to work as a core staff member, yet had no

ability to review consumer side effects, prior to the medication administration time nor the time to orient to the new work location individualized care plans, fire exits, fire extinguishers or the fire safety plan. Due to the complexities involved at this IRA location, the plaintiff hurt herself while lifting a consumer. The plaintiff was not at any time throughout her Capital District OPWDD career, provided any training for lifting and furthermore, there was no way for the plaintiff to recognize that a particular consumer wore two safety belts, one of which was entirely hidden under the consumer's sweater. Which led to the plaintiff's minor injury.

110.     Since the date of 8/29/15 up until the plaintiff's resignation on 1/13/16, OPWDD managers and officials only supported retaliation and duress for the plaintiff.

111. 1/28/16- The plaintiff resigned from OPWDD with a timely, two week notice effective 1/28/16.

112. September 2016- Lafountain defamed the Plaintiffs stellar work ethic and work reputation by maliciously informing an attorney from Disability Rights New York, that the plaintiff lies and abused FMLA sick leave.

113.  Despite the Plaintiffs repeated requests to be paid mileage reimbursement, the plaintiff was never reimbursed. NYS Finance law 202.

114. 1/25/15 OPWDD sent a notice to the plaintiff's home which threatened to withhold the Plaintiffs last paycheck, unless… the Plaintiff agreed to sign and return an attestation form stating that

the plaintiff worked in the capacity of a NYS Public Officer.
This OPWDD tactic threatened the plaintiff with up to a $40K
fine if the plaintiff was found in breach of the law and also
threatened the new employment position which the plaintiff was
about to begin.

### NINTH CAUSE OF ACTION
### Labor law 191

115. Despite the fact that the plaintiff solely worked on behalf of
disabled service recipients and that other grade-9 employees
who have separated from NY state service did not have to sign
this same form in order to collect their final, earned paycheck
and that by signing this form the plaintiff would not be allowed
to work with previous OPWDD recipients yet, many other
previous grade-9 employees can and do…this unjust threat was
further supported by the NYS Joint Commission on Public
Ethics.

116. The plaintiff's OPWDD employment duress increased even
after resigning from the agency. The lack of timely paycheck
wreaked havoc on the plaintiff's ability to pay her living
expenses.

117. The Plaintiff was never, in over a 20 year career, informed that
working for and on behalf of folks with disabilities was in the
capacity of a NYS Public Officer, the plaintiff never received
any Public Officer perks, privileges nor was the plaintiff privy
to NYS sensitive business or policy information nor did the
plaintiff ever take a Public Officers Oath and no other employee
that the plaintiff knows of, who departed from OPWDD in a

grade-9 caregiver position was made to sign a NYS Public Officers Law attestation form.

118. 1/13/16- The plaintiff properly provided OPWDD with a sufficient notice to resign, effective as of 1/28/16.

119. The plaintiff did not receive her final paycheck until April 4, 2016.

120. The plaintiff also put a request in writing to OPWDD to be paid for the re-assignment work, mileage reimbursement which the plaintiff had accrued. To date, the plaintiff was not responded to nor reimbursed.

121. While employed at OPWDD, the plaintiff was locked out of the OPWDD work computer. Hence, denied the opportunity to check her accrued vacation time against the final wages which were sent on April 4th 2016.

122. OPWDD Officials, collectively refused to acknowledge Mental Hygiene law 16.35 (3) (4).